ANDREW L. PACKARD (State Bar No. 168690)
WILLIAM N. CARLON (State Bar No. 305739)
Law Offices of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA 94952
Tel: (707) 782-4060
E-mail: andrew@packardlawoffices.com
        wncarlon@packardlawoffices.com

WILLIAM VERICK (State Bar No. 140972)
Klamath Environmental Law Center
1125 16th Street, Suite 204
Arcata, CA 95521
Tel: (707) 630-5061
E-mail: wverick@igc.org

Attorneys for Plaintiff
CALIFORNIANS FOR ALTERNATIVES
TO TOXICS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIANS FOR ALTERNATIVES TO TOXICS,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>R&L LUMBER COMPANY LLC, JUSTIN LENA, and UBI RUIZ,<br><br>　　　　Defendants. | Case No. 3:22-cv-07511-JSC<br><br>**SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251-1387)** |

CALIFORNIANS FOR ALTERNATIVES TO TOXICS ("CAT"), by and through its

counsel, hereby alleges:

## I.   JURISDICTION AND VENUE

1.      This is a civil suit brought under the citizen suit enforcement provision of the

Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387 (the "Clean Water Act," "CWA"

or "Act") against R&L Lumber Company LLC, Justine Lena, and Ubi Ruiz ("Defendants").

This Court has subject matter jurisdiction over the parties and the subject matter of this action

pursuant to Section 505(a)(1) of the Act, 33 U.S.C. § 1365(a), and 28 U.S.C. § 1331 (an action

arising under the laws of the United States).  Specifically, this action arises under Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A) (citizen suit to enforce effluent standard or limitation).  The relief requested is authorized pursuant to 33 U.S.C. §§ 1365(a) (injunctive relief), 1319(d) (civil penalties), and 28 U.S.C. §§ 2201–2202 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration).

2.      On December 30, 2022, Plaintiff provided written notice to Defendants, via certified mail, of Defendants' violations of the Act ("Supplemental Notice Letter"), and of Plaintiff's intention to file suit against Defendants, as required by the Act.  *See* 33 U.S.C. § 1365(b)(1)(A); 40 C.F.R. § 135.2(a)(1).  Plaintiff mailed a copy of the Supplemental Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); and the Executive Officer of the Regional Water Quality Control Board, North Coast Region ("Regional Board"), pursuant to 40 C.F.R. § 135.2(a)(1).  A true and correct copy of the Supplemental Notice Letter is attached hereto as **Exhibit 1** and is incorporated by reference.

3.      More than sixty days have passed since Plaintiff served the Supplemental Notice Letter on Defendants and the agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced nor is diligently prosecuting a court action to redress the violations alleged in this Complaint.  This action's claims for civil penalties are not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.      Venue is proper in the Northern District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this District.  Venue is also proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.  Intra-district venue is proper in Eureka, because the sources of the violations are located within Humboldt County.

//

1    **II.    INTRODUCTION**

2    5.    This Complaint seeks relief for Defendants' violations of the CWA at

3    Defendants' facility located at 1220 5th Street, in Arcata, California ("Facility").  Defendants

4    discharge pollutant-contaminated storm water associated with industrial activity from the Facility

5    into Janes Creek, Jolly Giant Creek, McDaniel Slough, Arcata Bay and the Pacific Ocean

6    ("Impacted Waters").  The Impacted Waters are waters of the United States within the meaning

7    of the Clean Water Act.  Defendants are in violation of both the substantive and procedural

8    requirements of the CWA.

9    6.    Defendants' unpermitted discharges of polluted storm water from the Facility

10   Between September 30, 2015 and December 4, 2022, Defendants discharged polluted storm

11   water from the Facility and, during that time, had not sought or obtained coverage for the Facility

12   under State of California's General Industrial Permit for storm water discharges, State Board

13   Water Quality Order No. 91-13-DWQ, *amended by* Nos. 92-12-DWQ, 97-03-DWQ, and 14-

14   0057-DWQ, NPDES General Permit No. CAS000001 (hereinafter "General Permit" or

15   "Permit").   Defendants obtained General Permit coverage for the Facility beginning December

16   5, 2022.  Since December 5, 2022, storm water discharges from the Facility have been in

17   violation of the General Permit.  Both types of discharges from the Facility – those without and

18   with General Permit coverage violate Section 301(a) of the Act, 33 U.S.C. § 1311(a), which

19   prohibits the discharge of storm water associated with industrial activities to waters of the United

20   States except in compliance with the terms of a National Pollutant Discharge Elimination System

21   ("NPDES") permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.  These

22   violations are ongoing and continuous.

23   7.    Defendants' failure to obtain coverage under, and to comply with, the General

24   Permit is a violation of Section 301(a) of the Act.

25   8.    The failure on the part of industrial facility operators, such as Defendants, to

26   apply for and comply with the General Permit is recognized as a significant cause of the

27   continuing decline in water quality of receiving waters.  The general consensus among regulatory

28   agencies and water quality specialists is that storm water pollution amounts to more than half the

total pollution entering the aquatic environment each year.  With every rainfall event, hundreds

of thousands of gallons of polluted storm water originating from industrial facilities discharge to

the Impacted Waters.

//

## III.    **PARTIES**

9.    Defendant R&L Lumber Company LLC is a California limited liability company.

10.    The Agent for Service of Process for R&L Lumber Company LLC is Brie Bales.

11.    Defendant Justin Lena is a manager or member of R&L Lumber Company LLC.

12.    Defendant Ubi Ruiz is a manager or member of R&L Lumber Company LLC.

13.    Plaintiff Californians for Alternatives to Toxics ("CAT") is a non-profit public

benefit corporation organized under the laws of California, based in Arcata, California.  CAT's

primary goal as an organization is to defend the environment from the effects of toxic chemicals,

and to preserve and protect human health, wildlife and recreational and aesthetic resources that

depend on the aquatic and riparian environment provided by the waters of the State of California

and of the United States.  This includes the waters referenced above, into which Defendants

discharge polluted storm water.  To further its goals, CAT actively seeks federal and state agency

implementation of state and federal water quality laws, including the CWA, and directly initiates

enforcement actions on behalf of itself and its members as necessary.

14.    Members of CAT—including citizens, taxpayers, property owners, and

residents—live, work, travel, and recreate on and near the Impacted Waters, into which

Defendants cause pollutants to be discharged.  These members of CAT use and enjoy the

Impacted Waters to obtain food they eat, as well as for recreational, educational, scientific,

conservation, aesthetic, and spiritual purposes.  Defendants' discharges of storm water

containing pollutants impairs each of those uses.  Thus, the interests of CAT's members have

been, are being, and will continue to be adversely affected by Defendants' failure to comply with

the CWA and the General Permit.

15.    Members of CAT reside in California and use and enjoy California's numerous

rivers for recreation and other activities.  Members of CAT use and enjoy the Impacted Waters,

into which Defendants have caused, are causing, and will continue to cause, pollutants to be discharged.  Members of CAT use these areas to hike, fish, boat, kayak, swim, bird watch, view wildlife, and engage in scientific study, including monitoring activities, among other things. Defendants' discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments.  Thus, the above-referenced gustatory, recreational and aesthetic interests of CAT's members have been, are being, and will continue to be adversely affected by Defendants' ongoing failure to comply with the CWA.  The relief sought herein will redress the harms to Plaintiff caused by Defendants' activities because that relief will significantly reduce pollution discharged from Defendants' Facility into the Impacted Waters.

16.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

## IV.    LEGAL BACKGROUND

### A.    Clean Water Act

17.     Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  The CWA establishes an "interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water . . . ."  33 U.S.C. § 1251(a)(2).  To these ends, Congress developed both a water quality-based and a technology-based approach to regulating discharges of pollutants from point sources into waters of the United States.

18.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant from a point source into waters of the United States, unless such discharge complies with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not in conformance with a NPDES permit, such as discharges without a NPDES permit or discharges that violate the terms of an NPDES permit issued pursuant to Section 402 of the Act (33 U.S.C. § 1342).

19.     The term "discharge of pollutants" means "any addition of any pollutant to

navigable waters from any point source." 33 U.S.C. § 1362(12).  Pollutants are defined to include, among other examples, industrial waste, chemical wastes, biological materials, heat, rock, and sand discharged into water.  33 U.S.C. § 1362(6).

20.    A "point source" is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).

21.    "Navigable waters" means "the waters of the United States."  33 U.S.C. § 1362(7).  Waters of the United States includes, among other things, waters that are or were susceptible to use in interstate commerce and tributaries to such waters.  40 C.F.R. § 230.3.

22.    Section 402 of the Act, 33 U.S.C. § 1342, establishes the NPDES program—a permitting program that regulates the discharge of pollutants into waters of the United States. Section 402(p) establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program, 33 U.S.C. § 1342(p), and, specifically, requires a NPDES permit for storm water discharges associated with industrial activity.  33 U.S.C. § 1342(p)(2)(B). Section 402 authorizes states with approved NPDES permit programs to regulate industrial storm water discharges, through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(b).

23.    Section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships for violations of NPDES permit requirements and for unpermitted discharges of pollutants.  33 U.S.C. § 1362(5); 33 U.S.C. §1365(a)(1) (authorizing actions against any person alleged to be in violation of an effluent standard or limitation); 33 U.S.C. § 1365(f) (defining "effluent limitation" broadly to include "a permit or condition thereof issued under [Section 402] of this title," and "any unlawful act under subsection (a) of [Section 301] of this title").

24.    An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $59,973 per day per violation for all violations occurring after November 2, 2015, pursuant to Sections 309(d) and

505 of the Act.  33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. §§ 19.1–19.4.

**B.    California Industrial Storm Water General Permit**

25.    Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of EPA has authorized the State Board to issue NPDES permits in California, including general permits.

26.    On November 16, 1990, the EPA promulgated Phase I storm water regulation in compliance with section 402(p) of the Act.  55 Fed. Reg. 47990, codified at 40 C.F.R. § 122.26. These regulations require operators of facilities subject to storm water permitting that discharge storm water associated with industrial activity to obtain an NPDES permit.  *Id*.

27.    The State Board elected to issue a statewide general permit for industrial discharges.  The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on April 17, 1997 and again on April 1, 2014 (effective July 1, 2015), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

28.    To discharge storm water associated with industrial activities lawfully in California, industrial dischargers must obtain General Permit coverage and comply with the terms of the General Permit, or obtain and comply with an individual NPDES permit.  33 U.S.C. §§ 1311(a), 1342(p)

29.    The industrial activities covered under the General Permit are described in Attachment A to the General Permit.

30.    Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent ("NOI").  The General Permit requires new dischargers to register for NOI coverage at least seven days prior to the commencement of industrial operations.  General Permit, Section II.B.5.  Dischargers with active NOI coverage under Order No. 97-03-DWQ were required to register for NOI coverage under Order No. 2014-0057-DWQ by July 1, 2015.  General Permit, Section II.B.4.b.

31.    Dischargers registering for NOI coverage under the General Permit must certify and submit Permit Registration Documents ("PRD") via the Storm Water Multiple Application

1    and Report Tracking System ("SMARTS") website.  General Permit, Section II.B.

2           32.     PRDs consist of a completed NOI and signed certification statement, a copy of a

3    current site map from the Storm Water Pollution Prevention Plan ("SWPPP"), and a SWPPP.

4    General Permit, Section II.B.1.b.

5           33.     Dischargers registering for NOI coverage under the General Permit must also pay

6    the appropriate annual fee in accordance with 23 C.C.R. § 2200 *et seq.*  General Permit, Section

7    II.B.1.c.

8           34.     When PRDs are certified and submitted and the annual fee is received, the State

9    Water Board will assign the discharger a Waste Discharger Identification ("WDID") number.

10          35.     New dischargers applying for NOI coverage under the General Permit that will be

11   discharging to a water body with a 303(d) listed impairment are ineligible for coverage unless

12   the discharger submits data and/or information, prepared by a Qualified Industrial Storm Water

13   Practitioner, demonstrating that (1) the discharger has eliminated all exposure to storm water of

14   the pollutant(s) for which the water body is impaired, has documented the procedures taken to

15   prevent exposure onsite, and has retained such documentation with the SWPPP at the facility; (2)

16   the pollutant(s) for which the water body is impaired is not present at the discharger's facility,

17   and the discharger has retained documentation of this finding with the SWPPP at the facility; or,

18   (3) the discharge of any listed pollutant will not cause or contribute to an exceedance of a water

19   quality standard.  This is demonstrated if: (1) the discharge complies with water quality

20   standards at the point of discharge, or (2) if there are sufficient remaining waste load allocations

21   in an approved TMDL and the discharge is controlled at least as stringently as similar discharges

22   subject to that TMDL.  General Permit, Section VII.B

23          36.     Once regulated by a NPDES permit, facilities must strictly comply with all of the

24   terms and conditions of that permit.  A violation of the General Permit is a violation of the Act.

25   *See* General Permit, Section XXI.A.

26          37.     New Dischargers registering for NOI coverage on or after July 1, 2015 shall

27   certify and submit PRDs via SMARTS at least seven days prior to commencement of industrial

28   activities or on July 1, 2015, whichever comes later.  General Permit, Section II.B.5.

38.     The General Permit contains three primary and interrelated categories of requirements: 1) discharge prohibitions, receiving water limitations, and effluent limitations; 2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and 3) monitoring and reporting requirements, including the requirement to prepare an annual report.

39.     Discharge Prohibition A prohibits all discharges of storm water to waters of the United States except as specifically authorized by the General Permit or another NPDES permit. General Permit, Section III.A.

40.     Discharge Prohibition B prohibits discharges of liquids or materials other than storm water, directly or indirectly, to waters of the United States unless authorized by another NPDES permit, except for specifically authorized non-storm water discharges enumerated in Section IV.  General Permit, Section III.B.

41.     Discharge Prohibition C prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance as defined in Section 13050 of the California Water Code.  General Permit, Section III.C.

42.     Discharge Prohibition D prohibits discharges that violate any discharge prohibition contained in an applicable regional water board water quality control plan or statewide water quality control plans and policies.  General Permit, Section III.D.

43.     Receiving Water Limitation A of the General Permit prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standards in any affected receiving water.  General Permit, Section VI.A.

44.     Receiving Water Limitation B prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.  General Permit, Section VI.B.

45.     Receiving Water Limitation C prohibits industrial storm water discharges that contain pollutants in quantities that threaten to cause pollution or a public nuisance.  General Permit, Section VI.C.

46.     The Water Quality Control Plan for the North Coast Region ("Basin Plan") identifies applicable water quality standards, including present and potential beneficial uses for

Humboldt Bay.[1]  These beneficial uses include Municipal and Domestic Supply ("MUN"), Agricultural Supply ("AGR"), Industrial Service Supply ("IND"), Industrial Process Supply ("PRO"), Freshwater Replenishment ("FRSH"), Navigation ("NAV"), Hydropower Generation ("POW"), Water Contact Recreation ("REC1"), Non-Contact Water Recreation ("REC2"), Commercial and Sport Fishing ("COMM"), Cold Freshwater Habitat ("COLD"), Wildlife Habitat ("WILD"), Rare, Threatened, or Endangered Species ("RARE"), Marine Habitat ("MAR"), Migration of Aquatic Organisms ("MIGR"), Spawning, Reproduction, and/or Early Development ("SPWN"), Shellfish Harvesting ("SHELL"), Estuarine Habitat ("EST"), Aquaculture ("AQUA"), and Native American Culture ("CUL").

47.     The State Board's 2020/2022 California Integrated Report (Clean Water Act Section 303(d) List/305(b) Report) lists the following impairments for Humboldt Bay: Dioxin Toxic Equivalents and Polychlorinated biphenyls.

48.     The General Permit requires dischargers to prepare and submit documentation to the Regional Board upon determination that storm water discharges are occurring in violation of the General Permit's Receiving Water Limitations.  General Permit, Section XX.B.

49.     Effluent Limitation A of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  General Permit, Section V.A.

50.     EPA has established Benchmark Levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT standards.  65 Fed. Reg. 64746, 64767 (Oct. 30, 2000).  The following EPA benchmarks have been established for pollutants discharged by R&L Lumber: Total Suspended Solids – 100 mg/L; Oil & Grease – 15.0 mg/L; pH – 6.0-9.0 s.u., Chemical Oxygen Demand – 120 mg/L; Zinc – 0.26 mg/L; Aluminum – 0.75 mg/L; Iron – 1.0 mg/L; Lead – 0.262 mg/L; and Copper – 0.0332

---

[1] The northern lobe of the estuary is known as Arcata Bay.  Basin Plan at 4-5.

mg/L.

51.     The General Permit requires dischargers to develop and implement a site-specific SWPPP.  General Permit, Section X.A.  The SWPPP must include, among other elements:  (1) the facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) an annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable.  General Permit, Section X.A.  The assessment of potential pollutant sources (referred to as the "pollutant source assessment") must include a narrative assessment of all areas of industrial activity, which identifies (amongst other things) any additional parameters that must be monitored in storm water outfalls due to the facility's specific industrial activities.  General Permit, Section X.G.2.d.

52.     Dischargers must revise their SWPPP whenever necessary and certify and submit their SWPPP via the Regional Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") within 30 days whenever the SWPPP contains significant revision(s) (and, for non-significant revisions, certify and submit their SWPPP not more than once every three (3) months).  General Permit, Section X.B.

53.     Dischargers must implement the minimum BMPs identified in Section X.H.1. of the General Permit.  In addition to the minimum BMPs identified in Section X.H.1, advanced BMPs must be implemented to reduce or prevent discharges of pollutants in storm water dischargers in a manner that reflects best industry practice.  General Permit, Section X.H.2.

54.     Special Condition B requires a discharger to prepare and submit documentation to the Regional Board upon determination that storm water discharges are in violation of the General Permit's Receiving Water Limitations.  The documentation must describe changes the discharger will make to its current BMPs to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  General Permit, Section XX.B.

55.     Section XV of the General Permit requires an annual evaluation of storm water

controls, including the preparation of an evaluation report, and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities within 90 days of the annual evaluation.

56. The General Permit requires dischargers to implement a Monitoring Implementation Plan.  General Permit, Section X.I.  As part of their monitoring plan, dischargers must identify all storm water discharge locations.  General Permit, Section X.I.2.  Dischargers must then conduct monthly visual observations of each drainage area, as well as visual observations during discharge sampling events.  General Permit, Section XI.A.1, 2.  Dischargers must also collect and analyze storm water samples from two storm events within the first half of each reporting year (July 1 to December 31) and two storm events during the second half of each reporting year (January 1 to June 30).  General Permit, Section XI.B.  During the wet season, dischargers must sample and analyze for basic parameters such as pH, total suspended solids ("TSS"), oil and grease ("O&G"), certain industry-specific parameters, and any other pollutants likely to be in the storm water discharged from the facility based on the pollutant source assessment.  General Permit, Section XI.B.6.

57. Dischargers must submit all sampling and analytical results via SMARTS within thirty days of obtaining all results for each sampling event.  General Permit, Section XI.B.11.

58. Sampling results must be compared to the two types of Numeric Action Level ("NAL") values set forth at Table 2 of the General Permit.  General Permit, Section XII.  An annual NAL exceedance occurs when the average of the results for a parameter for all samples taken within a reporting year exceeds the annual NAL value.  General Permit, Section XII.A.1.  An instantaneous NAL exceedance occurs when two or more results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value.  General Permit, Section XII.A.2.  If a discharger has a NAL exceedance for a parameter during a reporting year, the discharger is assigned a "Level 1" status for that parameter, and the discharger must comply with additional requirements set forth at Section XII.C.  The discharger's status changes to "Level 2" status if sampling results indicate another NAL exceedance for that parameter while the discharger is still in Level 1 status.  If a discharger

becomes Level 2 status, it must comply with the additional obligations set forth at Section XII.D.

59.     Dischargers must submit an Annual Report no later than July 15th following each reporting year, certifying compliance with the General Permit and/or an explanation for any non-compliance.  General Permit, Section XVI.

## V.     STATEMENT OF FACTS

### a.     The Facility.

60.     Defendants own and operate the Facility, a lumber mill located in Humboldt County, California.

61.     Defendants have operated the Facility for approximately 5 years.

62.     Defendants' primary industrial activities at the Facility include the milling of logs, storage and treatment of logs, de-barking of logs, the storage and handling of soil amendments, the storage of dimensional lumber, loading and unloading of logs and wastes associated with log-processing, equipment storage and maintenance, and the storage of various industrial materials, including bark, sawdust, oil and grease, and fuel.

63.     Defendants conduct many of the industrial activities described above outside in areas exposed to storm water.  As seen in the photograph of the Facility, taken on October 2, 2022, and attached hereto as **Exhibit 2**, Defendants stockpile logs, finished wood products, sawdust, and offcuts outside where the materials are exposed to storm water.

64.     Defendants operate heavy equipment, including trucks for transporting logs, sawdust and other materials, wheel loaders, log loading cranes, forestry equipment, and milling equipment associated with the production and management of the industrial materials.

65.     Operation of the heavy equipment described above causes the unpaved surfaces at the Facility to erode, and make available for discharge the pollutants otherwise bound in the soil.

66.     The industrial activities at the Facility fall under Standard Industrial Classification ("SIC") Codes 2411 ("Logging") and 2421 – ("Sawmills and Planing Mills").

67.     The Facility collects and discharges storm water associated with industrial activity from the Facility into a roadside ditch that runs along Highway 255 ("Highway 255 Ditch").

68.     Defendants store industrial materials, including sawdust, bark, and other log-

processing byproducts and wastes, in the areas of its Facility that are adjacent to the Highway 255 Ditch.

69.     Plaintiff is informed and believes, and on that basis alleges, that it was Defendants' practice to store industrial materials such that they spilled into the Highway 255 Ditch up to and including October 2, 2022.

70.     Plaintiff is informed and believes, and on that basis alleges, that it is likely industrial materials can spill into the Highway 255 Ditch in the future, should Defendants change their storage practices again.

71.     During rain events, storm water comes into contact with these industrial materials, stockpiled in the open, and storm water discharges from the Facility into the Highway 255 Ditch.

72.     Storm water that comes into contact with Defendants' industrial activities and materials picks up pollutants, such as sediment, oil and grease, material that elevates chemical oxygen demand, tannins and lignens, metals such as lead, iron and aluminum, semi-volatile organic compounds such as pentachlorophenol, tetrachlorophenol, polychlorinated dibenzo dioxins and polychlorinated dibenzo furans, and discharges them from the Facility into the Highway 255 Ditch.

73.     The Highway 255 Ditch carries the pollutants discharged from the Facility to Janes Creek, Jolly Giant Creek, McDaniel Slough, and then eventually to Arcata Bay and the Pacific Ocean.

74.     Janes Creek, Jolly Giant Creek, McDaniel Slough, Arcata Bay and the Pacific Ocean are waters of the United States within the meaning of the Clean Water Act.  40 C.F.R. § 120.2(3).

75.     Arcata Bay is listed on the California 2020-2022 Integrated Report 303(d) List as being impaired for Dioxin Toxic Equivalents and PCBs (Polychlorinated biphenyls).

### b.  Historical Uses of the Facility

76.     The historical uses of the Facility include a lumber mill that treated lumber with pentachlorophenol ("PCP") and tetrachlorophenol ("TCP") and manufactured glue laminated wood beams between 1965 and 1980.

77.     Pentachlorophenol and by-products of its synthesis includes higher-chlorinated dioxins and furans, polychlorinated phenols, hexachloro benzene, and other by-products.

78.     In February of 1987, storm water runoff samples were found to contain PCP and TCP.

79.     On December 31, 1987, the Regional Board issued Cleanup and Abatement Order No. 87-148 for Beaver Lumber Company of Arcata, who was then operating at the site.

80.     Between December 1989 and January 1990, approximately 3,100 tons of contaminated soil and 85,000 gallons of contaminated groundwater were removed from the site.

81.     A groundwater pump and treat system operated at the site between May 1993 and November 1997 which removed, treated and disposed of over 2 million gallons of contaminated groundwater.

82.     Beginning in July 2002, an additional 2,200 tons of contaminated soils were removed from the site.

83.     An August 1, 2005 Soil and Groundwater Management Contingency Plan ("Contingency Plan") prepared by SHN Consulting Engineers & Geologists, Inc. indicates that, despite the remediation, contaminated soil and groundwater may still exist at various areas of the site.

84.     Specifically, the Contingency Plan identifies areas in the vicinity of building foundations, due to limited access during excavation, that are known to have remaining soil contamination.

85.     The Contingency Plan attaches a Site Safety Plan which states that "[t]he soils are known to contain residual contamination of these materials: Pentachlorophenol (PCP), Tetrachlorophenol (TCP), and Stoddard Solvent."

**c.   Defendants' Failure to Register for NOI General Permit Coverage.**

86.     Defendants operated the Facility without NOI coverage under the General Permit (Order No. 97-03-DWQ) since it began operations approximately five years ago until December 5, 2022.

87.     Defendants have operated their Facility without any General Permit coverage

continuously from the beginning of their operations to December 5, 2022.

88.     Defendants continue to discharge storm water associated with industrial activities from the Facility.

89.     On November 2, 2022, Regional Board staff performed an unannounced inspection at the Facility and prepared an inspection memorandum that was uploaded to SMARTS on November 18, 2022 ("Inspection Memorandum").  A true and correct copy of the Inspection Memorandum is attached hereto as **Exhibit 3**.

90.     The Inspection Memorandum includes photographs of Defendants' industrial activities and industrial materials and notes that Defendants "were in violation of [General Permit] requirements for failure to obtain the permit coverage" at the time of the inspection.

91.     On December 5, 2022, the State Board received and processed Defendants' Notice of Intent to Comply with the Industrial General Permit ("NOI"), and assigned the WDID 1 12I030010 to Defendants' Facility.

92.     Up until November 30, 2022, Defendants had not certified and submitted a completed NOI and signed certification statement to SMARTS.

93.     Up until November 30, 2022, Defendants had not certified and submitted a copy of a current site map from the SWPPP to SMARTS.

94.     Up until November 30, 2022, Defendants had not certified and submitted a SWPPP to SMARTS.

95.     Up until November 30, 2022, Defendants had not paid the appropriate annual fee in accordance to General Permit Section II.B.2.c and 23 C.C.R. § 2200 et seq.

96.     Up until December 5, 2022, the State Water Board had not assigned Defendants a WDID for the Facility.

97.     Defendants discharge into Arcata Bay pollutants for which Arcata Bay is impaired and are thus ineligible for General Permit coverage unless they comply with the requirements of General Permit Section VII.B.

98.     Defendants have not complied with the requirements of General Permit Section VII.B.1 because they have not eliminated all exposure to storm water of dioxins and

polychlorinated biphenyls, they have not documented the procedures taken to prevent exposure onsite, and they have not retained such documentation with the SWPPP at the Facility.

99.    Defendants have not complied with the requirements of General Permit Section VII.B.2 because they have not adequately demonstrated that dioxins and polychlorinated biphenyls are not present at the Facility, and Defendants have not retained documentation of this finding with the SWPPP at the Facility.

100.    Defendants have not complied with the requirements of General Permit Section VII.B.3 because they have not demonstrated that the discharge of dioxins and polychlorinated biphenyls will not cause or contribute to an exceedance of a water quality standard.

101.    Because Defendants have not complied with General Permit Section VII.B, they are not eligible for General Permit Coverage.

### d.  Defendants' Operations Since Obtaining Permit Coverage

102.    Since obtaining General Permit coverage on December 5, 2022, Defendants have experienced several large rain events that demonstrated Defendants' failure to adequately reduce or prevent pollutants in storm water discharges from the Facility.

103.    Plaintiff, based on observations from outside the Facility, is informed and believes, and on that basis alleges, that during the storm events of December 8, 2022 and December 11, 2022, the Facility discharged highly turbid storm water associated with industrial activities to the Impacted Waters.

104.    Plaintiff observed the conditions at the Facility during the discharges identified above, as well as any BMPs that the Facility had implemented by the dates of discharge.  Based on these observations, Plaintiff alleges that the Facility's BMPs are inadequate to reduce or prevent pollutants from discharging from the Facility.

105.    Specifically, on December 8, 2022, Plaintiff observed highly turbid water discharging from the southwest corner of the Facility into the Highway 255 Ditch.  BMPs, to the extent any were implemented, appeared to be entirely ineffective at either preventing or reducing the pollutant load in the storm water discharges observed.

106.    Also on December 8, 2022, Plaintiff observed storm water with an oily sheen

discharging from the Facility into the Highway 255 Ditch, and into another ditch that Plaintiff is informed and believes, and on that basis alleges, discharges to the Impacted Waters.

107.    On December 11, 2022, Plaintiff again observed the Facility under wet weather conditions.

108.    On December 11, 2022, Plaintiff observed that, as on December 8, 2022, many parts of the Facility were inundated such that ponded storm water was in contact with industrial materials, and large ponds were present in areas that appeared to be areas where industrial activities were conducted.

109.    On December 11, 2022, Plaintiff observed highly turbid storm water discharging from the southwest corner of the Facility into the Highway 255 Ditch.  BMPs, to the extent any were implemented, appeared to be entirely ineffective at either preventing or reducing the pollutant load in the storm water discharges observed.

110.    On December 11, 2022, Plaintiff observed storm water with an oily sheen discharging from the Facility into the Highway 255 Ditch, and into another ditch that Plaintiff is informed and believes, and on that basis alleges, discharges to the Impacted Waters.

111.    On December 30, 2022, Plaintiff observed similar conditions at the Facility as those observed on December 8th and 11th; however, by this point Defendants had covered much of the southwest corner of the Facility in stone and gravel.  Plaintiff alleges that this practice, to the extent that it was implemented as a BMP to address storm water pollutants, is ineffective at reducing or preventing pollutant discharges in the Facility's storm water.

112.    On December 30, 2022, Plaintiff observed highly turbid storm water discharging from the southwest corner of the Facility into the Highway 255 Ditch.  BMPs, to the extent any were implemented, appeared to be entirely ineffective at either preventing or reducing the pollutant load in the storm water discharges observed.

113.    On January 13, 2023, Defendants' consultant submitted via SMARTS a stand-alone amendment to Defendants' SWPPP which documented Defendants' decision to remove, but not replace, sample location DA-1.  Defendants acknowledge that the sample location remains a discharge point.

## VI.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Discharge of Pollutants from the Facility in Violation of the Act**
**(Violations of 33 U.S.C. §§ 1311(a), 1342)**

114.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

115.   Plaintiff is informed and believes, and thereupon alleges, that on every day identified in Attachment A to the Notice Letter, and during every significant rain event between at least September 30, 2017 and the date of the filing of this Complaint, Defendants violated section 301(a) of the CWA, 33 U.S.C. § 1311(a), by discharging storm water associated with industrial activities generated at its Facility into the Impacted Waters without a NPDES permit issued pursuant to 33 U.S.C. § 1342.

116.   Each and every day Defendants discharge, and continue to discharge, pollutants to waters of the United States from the Facility without, or in violation of, a NPDES permit issued pursuant to 33 U.S.C. § 1342 is a separate and distinct violation of Section 301(a) of the Act.  33 U.S.C. § 1311(a).

117.   Defendants are subject to civil penalties for each and every violation of the Act since September 30, 2017.  See 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

118.   These violations were ongoing and continuous during the period Defendants operated their Facility without a permit as required by 33 U.S.C. §§ 1311, 1342.  Violations of the Act remain ongoing and continuous and will continue to be so, so long as Defendants continue to discharge storm water from the Facility in violation of the General Permit.

119.   Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the United States, Plaintiff, and its members, for which harm Plaintiff has no plain speedy or adequate remedy at law.

//

//

//

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## SECOND CLAIM FOR RELIEF

**Failure to Develop and Implement an Adequate
Storm Water Pollution Prevention Plan for the Facility
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

120.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

121.    Section X of the General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP prior to commencement of industrial activities.

122.    Defendants have failed to develop and implement an adequate SWPPP for the Facility.  Defendants' ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, inter alia, Defendants' outdoor storage of industrial materials without appropriate best management practices; the failure to identify all discharge locations and drainage areas; the lack of specificity and detail required by the General Permit; the failure to include a compliant site map; the failure to keep the SWPPP updated; the continued exposure of significant quantities of industrial materials to storm water flows; the failure to either treat storm water prior to discharge or to implement effective containment practices that prevent the discharge of polluted storm water; and the continued discharge of storm water pollutants from the Facility at levels in excess of EPA benchmark values and other applicable standards.

123.    The Facility's SWPPP fails to identify each discharge point from the Facility.

124.    Defendants' removal of sample location DA-1, without replacing or identifying a new discharge or sample location renders the SWPPP incomplete because the SWPPP and site map now fail to identify all discharge locations.

125.    The Facility's SWPPP fails to identify each BMP implemented at the Facility, and to the extent that the SWPPP does identify BMPs, they are deficient because they fail to reduce or prevent pollutants from being discharged in the Facility's storm water discharges.

126.    Defendants continue to violate the Act each day that they fail to develop and fully implement an adequate SWPPP for the Facility.  These violations are ongoing and continuous.

127.    Each day that Defendants have failed to develop and implement an adequate

SWPPP for the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since December 5, 2022.  See 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

## THIRD CLAIM FOR RELIEF

### Failure to Develop and Implement the Best Available And Best Conventional Treatment Technologies at the Facility (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

128.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

129.    The General Permit's SWPPP requirements and Section V.A. require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

130.    To meet the BAT/BCT standard, dischargers must implement minimum BMPs and any advanced BMPs set forth in the General Permit's SWPPP Requirements provisions where necessary to reduce or prevent pollutants in discharges.  See General Permit, Sections X.H.1–2.

131.    Defendants have failed to implement BAT and BCT at the Facility for its discharges of total suspended solids, oil and grease, pH, chemical oxygen demand, zinc, aluminum, iron, lead, and copper in violation of Section V.A. of the General Permit.

132.    Defendants have failed to implement the minimum BMPs required by the General Permit, including: good housekeeping requirements; preventive maintenance requirements; spill and leak prevention and response requirements; material handling and waste management requirements; erosion and sediment controls; employee training and quality assurance; and record keeping.  General Permit, Sections X.H.1(a)–(g).

133.    Defendants have further failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including: exposure minimization BMPs; containment and discharge reduction BMPs; treatment

control BMPs; or other advanced BMPs necessary to comply with the General Permit's effluent limitation guidelines.  General Permit, Section X.H.2.

134.     Defendants' ongoing failure to develop and implement BAT and BCT at the Facility is evidenced by, inter alia, Defendants' deficient SWPPP and poor housekeeping, and Defendants' failure to prevent or reduce the highly turbid storm water from discharging from the Facility; and Defendants' failure to prevent storm water polluted with an oily sheen from discharging from the Facility.

135.     Each day that Defendants have failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

136.     Defendants continue to be in violation of the BAT and BCT requirements each day that it fails to develop and fully implement BMPs meeting the BAT and BCT standards. These violations are ongoing and continuous.

137.     Defendants have been in violation of the BAT and BCT requirements at the Facility every day since at least December 5, 2022.  Defendants are subject to civil penalties for each and every violation of the Act since December 5, 2022.  See 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

## FOURTH CLAIM FOR RELIEF

### Failure to Develop and Implement an Adequate
### Monitoring Implementation Plan for the Facility
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

138.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

139.     Sections X.I and XI of the General Permit require dischargers of storm water associated with industrial activity to develop and implement a monitoring implementation plan (including, among other things, sampling and analysis of discharges) prior to commencement of industrial activities.

140.     Defendants have failed to develop and implement an adequate monitoring

implementation plan for the Facility.  Defendants' ongoing failure to develop and implement adequate monitoring and reporting programs is evidenced by, inter alia, their continuing failure to collect and analyze storm water samples from all discharge locations and their continuing failure to analyze storm water samples for pollutants likely to be present in the Facility's storm water discharges in significant quantities and other pollutants as the General Permit requires.

141.    Defendants' failure to designate every storm water discharge point from the Facility is a violation of General Permit Section XI.B.4.

142.    Defendants' failure to collect samples from every storm water discharge point from the Facility is a violation of General Permit Section XI.B.4.

143.    Defendants failed to analyze all samples of storm water for all required parameters, including any unknown parameters that could only be determined by performing an adequate pollutant source assessment, in violation of Section XI.B.6.c.

144.    Defendants have failed to develop and implement an adequate monitoring and reporting program for the Facility each day since at least December 5, 2022.  These violations are ongoing and continuous.

145.     Each day of violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since December 5, 2022.  See 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

## FIFTH CLAIM FOR RELIEF

**Discharges of Contaminated Storm Water from the Facility
in Violation of the Permit's Water Quality-Based Conditions and the Act
(Violations of 33 U.S.C. §§ 1311(a), 1342)**

146.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

147.    Sections VI.A and VI.B of the General Permit require that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards in

any affected receiving water.  Section III.C of the General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.

148.    Plaintiff is informed and believes, and thereupon alleges, that since at least December 5, 2022, Defendants have been discharging polluted storm water from the Facility into the Impacted Waters, in violation of the General Permit's water quality-based conditions.

149.    During every significant rain event, storm water flowing over and through materials at the Facility becomes contaminated with pollutants, flowing untreated or insufficiently treated from the Facility to the Impacted Waters.

150.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing pollution and contamination of waters of the United States in violation of Section III.C of the General Permit.

151.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Sections VI.A and VI.B of the General Permit.

152.    Defendants' discharges adversely affect human health or the environment in violation of Section VI.B of the General Permit.  The Facility's storm water sample results demonstrate that Defendants' discharges cause or contribute to violations of the Basin Plan's discharge prohibitions and water quality standards discussed above in violation of Section VI.A of the General Permit.

153.    Plaintiff is informed and believes, and thereupon alleges, that on every day with significant rainfall since December 5, 2022, Defendants have discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit.  These violations are ongoing and continuous.

154.    Every day Defendants have discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since December 5, 2022.  See 33 U.S.C. §§ 1319(d), 1365; 40

C.F.R. § 19.4.

**VII.    RELIEF REQUESTED**

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.    Declare Defendants to have violated and continue to be in violation of CWA section 301(a), 33 U.S.C. § 1311(a), for discharging pollutants from the Facility not in compliance with a permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342;

b.    Enjoin Defendants from discharging pollutants from the Facility and to the surface waters surrounding and downstream from the Facility in violation of the General Permit and the Clean Water Act;

c.    Enjoin Defendants from further violating the substantive and procedural requirements of the General Permit and the Clean Water Act;

d.    Order Defendants to pay civil penalties of $59,973 per day per violation for each violation, pursuant to Sections 309(d) and 505(a) of the Clean Water Act, 33 U.S.C. §§ 1319(d), 1365(a), and 40 C.F.R. §§ 19.1–19.4;

e.    Order Defendants to take appropriate actions to restore the quality of navigable waters impaired by its activities;

f.    Award Plaintiff's costs and fees (including reasonable attorney, witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

g.    Award any such other and further relief as this Court may deem appropriate.

Dated: March 1, 2023                            Respectfully Submitted,

                                                                LAW OFFICES OF ANDREW L. PACKARD

                                                                By: /s/ William N. Carlon

                                                                William N. Carlon
                                                                Attorney for Plaintiff
                                                                CALIFORNIANS FOR
                                                                ALTERNATIVES TO TOXICS

# EXHIBIT 1

Law Offices Of

# ANDREW L. PACKARD

245 Kentucky Street, Suite B3, Petaluma, CA 94952
Phone (707) 782-4060   Fax (707) 782-4062
Info@PackardLawOffices.com

December 30, 2022

**VIA CERTIFIED MAIL**

Justin Lena and Ubi Ruiz                  Brie Bales
R&L Lumber Company LLC                     R&L Lumber Company LLC
1220 5th Street                            2336 Bates Avenue
Arcata, CA 95521                           Concord, CA 94520

Re:    **NOTICE OF VIOLATIONS AND INTENT TO FILE SUIT UNDER THE
       FEDERAL WATER POLLUTION CONTROL ACT ("CLEAN WATER ACT")
       (33 U.S.C. §§ 1251 *et seq.*)**

Dear Justin Lena, Ubi Ruiz, and Brie Bales:

Californians for Alternatives to Toxics ("CATs") provides this notice of violations of the
Clean Water Act ("the Act") occurring at R&L Lumber's industrial facility located at 1220 5th
Street, in Arcata, California (the "Facility").  This letter is being sent to you as the responsible
owners, officers and/or operators of the Facility.  Unless otherwise noted, R&L Lumber
Company LLC, Justin Lena, Ubi Ruiz, and Brie Bales shall hereinafter be collectively referred to
as "R&L Lumber."  CATs is a non-profit corporation dedicated to the preservation, protection
and defense of the environment, wildlife and natural resources of California waters, including the
waters into which R&L Lumber discharges polluted storm water.

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil
Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects
R&L Lumber to a penalty of up to $59,973 per day per violation for all violations occurring
between September 30, 2017 and the present.  In addition to civil penalties, CATs will seek
injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33
U.S.C. § 1365(a) and (d)) and such other relief as permitted by law.  Lastly, Section 505(d) of
the Act (33 U.S.C. § 1365(d)) permits prevailing parties to recover costs and fees, including
attorneys' fees.

The Clean Water Act requires that sixty (60) days prior to the initiation of a citizen-
enforcement action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen enforcer
must give notice of its intent to file suit.  Notice must be given to the alleged violator, the U.S.
Environmental Protection Agency, and the Chief Administrative Officer of the water pollution
control agency for the State in which the violations occur.  *See* 40 C.F.R. § 135.2.  As required
by the Act, this letter provides statutory notice of the violations that have occurred, and continue
to occur, at the Facility.  40 C.F.R. § 135.3(a).  At the expiration of sixty (60) days from the date
of this letter, CATs intends to amend the complaint it has filed in the existing Northern District
of California case, 1-22-cv-07511 JSC to allege that this letter has been sent and to include in the

Notice of Violation and Intent to File Suit
December 30, 2022
Page 2

complaint in that action the allegations made in this letter.

## I.   Background.

### A.   The Clean Water Act.

Congress enacted the CWA in 1972 in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251.  The Act prohibits the discharge of pollutants into United States waters except as authorized by the statute. 33 U.S.C. § 1311; *San Francisco BayKeeper, Inc. v. Tosco Corp*., 309 F.3d 1153, 1156 (9th Cir. 2002).  The Act is administered largely through the NPDES permit program.  33 U.S.C. § 1342. In 1987, the Act was amended to establish a framework for regulating storm water discharges through the NPDES system.  Water Quality Act of 1987, Pub. L. 100-4, § 405, 101 Stat. 7, 69 (1987) (codified at 33 U.S.C. § 1342(p)); *see also Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 840-41 (9th Cir. 2003) (describing the problem of storm water runoff and summarizing the Clean Water Act's permitting scheme). The discharge of pollutants without an NPDES permit, or in violation of a permit, is illegal.  *Ecological Rights Found. v. Pacific Lumber Co*., 230 F.3d 1141, 1145 (9th Cir. 2000).

Much of the responsibility for administering the NPDES permitting system has been delegated to the states.  *See* 33 U.S.C. § 1342(b); *see also* Cal. Water Code § 13370 (expressing California's intent to implement its own NPDES permit program).  The CWA authorizes states with approved NPDES permit programs to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(b). Pursuant to Section 402 of the Act, the Administrator of EPA has authorized California's State Board to issue individual and general NPDES permits in California. 33 U.S.C. § 1342.

### B.   California's General Permit for Storm Water Discharges Associated with Industrial Activities

On July 1, 2015, pursuant to Order No. 2015-0057-DWQ the General Permit was reissued, including many of the same fundamental terms as the prior permit.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activities that have not obtained an individual NPDES permit must apply for coverage under the General Permit by filing a Notice of Intent to Comply ("NOI").  General Permit, Standard Condition XXI.A.  Facilities must file their NOIs before the initiation of industrial operations.  *Id.* Facilities must strictly comply with all of the terms and conditions of the General Permit.  A violation of the General Permit is a violation of the CWA.

Facilities must strictly comply with all of the terms and conditions of the General Permit. A violation of the General Permit is a violation of the CWA.

The General Permit contains three primary and interrelated categories of requirements: (1) discharge prohibitions, receiving water limitations and effluent limitations; (2) Storm Water

Notice of Violation and Intent to File Suit
December 30, 2022
Page 3

Pollution Prevention Plan ("SWPPP") requirements; and (3) self-monitoring and reporting requirements.

### C.    R&L Lumber's Arcata Facility

R&L Lumber operates a lumber yard in Humboldt County where it conducts various industrial activities, including the storage and treatment of logs, de-barking of logs, the storage and handling of soil amendments/compost, loading and unloading of logs and wastes associated with log-processing, equipment storage and maintenance, and the storage of various industrial materials, including bark, sawdust, oil and grease, dirt, and fuel.  The industrial activities at the Facility fall under Standard Industrial Classification ("SIC") Codes 2411 – ("Logging") and 2421 – ("Sawmills and Planing Mills").

R&L Lumber collects and discharges storm water associated with industrial activities at the Facility into Janes Creek, Jolly Giant Creek, McDaniel Slough, Arcata Bay, and the Pacific Ocean.  Janes Creek, Jolly Giant Creek, McDaniel Slough, Arcata Bay and the Pacific Ocean ("Impacted Waters") are waters of the United States within the meaning of the Clean Water Act.

R&L Lumber's Facility appears to be mostly paved, and the potential for storm water runoff is high.  Adjacent to the Facility's southern boundary is a roadside ditch that runs along Highway 255.  R&L Lumber stores industrial materials, including sawdust, bark, and other log-processing byproducts and wastes, in the areas of its Facility that are adjacent to this storm water ditch, and in some places, R&L Lumber's industrial materials spill into the ditch.  During rain events, storm water comes into contact with these industrial materials, stockpiled in the open, and storm water discharges from the Facility into the roadside ditch.  Storm water that comes into contact with R&L Lumber's industrial activities and materials picks up pollutants, such as sediment, oil and grease, material that elevates chemical oxygen demand, tannins and lignens, metals such as lead, iron and aluminum, semi-volatile organic compounds such as pentachlorophenol, tetrachlorophenol, polychlorinated dibenzo dioxins and polychlorinated dibenzo furans.  This ditch carries the pollutants discharged from the Facility to Janes Creek, Jolly Giant Creek, McDaniel Slough, and then eventually to Arcata Bay and the Pacific Ocean

## II.    R&L Lumber's Violations of the Act and Permit.

Based on its review of available public documents, CATs is informed and believes that R&L Lumber is in ongoing violation of both the substantive and procedural requirements of the CWA and the General Permit.  These violations are ongoing and continuous.  Consistent with the statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, R&L Lumber is subject to penalties for violations of the Act since December 5, 2022.

Notice of Violation and Intent to File Suit
December 30, 2022
Page 4

> **A.      R&L Lumber Discharges Storm Water Containing Pollutants in Violation of the General Permit's Discharge Prohibitions, Receiving Water Limitations and Effluent Limitations.**

> **1.      Applicable Water Quality Standards.**

The General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.  General Permit, Discharge Prohibition III.C.  The General Permit also prohibits discharges that violate any discharge prohibition contained in the applicable Regional Water Board's Basin Plan or statewide water quality control plans and policies.  General Permit, Discharge Prohibition III.D.  Furthermore, storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards in any affected receiving water.  General Permit, Receiving Water Limitations VI.A, VI.B.

Dischargers are also required to prepare and submit documentation to the Regional Board upon determination that storm water discharges are in violation of the General Permit's Receiving Water Limitations.  General Permit, Special Condition XX.B.  The documentation must describe changes the discharger will make to its current storm water best management practices ("BMPs") in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  *Id.*

> **2.      Applicable Effluent Limitations.**

Dischargers are required to reduce or prevent pollutants in their storm water discharges through implementation of best available technology economically achievable ("BAT") for toxic and nonconventional pollutants and best conventional pollutant control technology ("BCT") for conventional pollutants.  General Permit, Effluent Limitation V.A.  Conventional pollutants include Total Suspended Solids, Oil & Grease, pH, Biochemical Oxygen Demand and Fecal Coliform.  40 C.F.R. § 401.16.  All other pollutants are either toxic or nonconventional.  40 C.F.R. §§ 401.15-16.

Under the General Permit, benchmark levels established by the EPA ("EPA benchmarks") serve as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT.  *Santa Monica Baykeeper v. Kramer Metals,* 619 F. Supp. 2d 914, 920, 923 (C.D. Cal 2009); General Permit, Exceedance Response Action XII.A.

The following EPA benchmarks have been established for pollutants discharged by R&L Lumber: Total Suspended Solids – 100 mg/L; Oil & Grease – 15.0 mg/L; pH – 6.0-9.0 s.u., Chemical Oxygen Demand – 120 mg/L; Zinc – 0.26 mg/L; Aluminum – 0.75 mg/L; Iron – 1.0 mg/L; Lead – 0.262 mg/L; and Copper – 0.0332 mg/L.

Notice of Violation and Intent to File Suit
December 30, 2022
Page 5

### 3.     R&L Lumber's Discharges of Polluted Storm Water

R&L Lumber obtained General Permit coverage on December 5, 2022[1], and since then several rain events have occurred that have caused the Facility to discharge storm water associated with industrial activities to the Impacted Waters.  Specifically, CATs has observed highly turbid storm water discharging from the Facility on several occasions, including December 8, 2022, and December 11, 2022.  On at least one occasion, storm water with a visible oily sheen was being discharged from the Facility.

CATs' observations demonstrate violations of the Permit's discharge prohibitions, receiving water limitations and effluent limitations set forth above.  CATs is informed and believes that R&L Lumber has known that its storm water contains pollutants at level exceeding General Permit standards since at least December 5, 2022.

CATs alleges that such violations occur each time storm water discharges from the Facility.  Attachment A hereto, sets forth the specific rain dates on which CATs alleges that R&L Lumber has discharged storm water containing impermissible levels of pollutants in violation of the General Permit.  General Permit, Discharge Prohibitions III.C and III.D, Receiving Water Limitation VI.A, VI.B.

### B.  R&L Lumber Has Failed to Implement BAT and BCT

Dischargers must implement BMPs that fulfill the BAT/BCT requirements of the CWA and the General Permit to reduce or prevent discharges of pollutants in their storm water discharges.  General Permit, Effluent Limitation V.A.  To meet the BAT/BCT standard, dischargers must implement minimum BMPs and any advanced BMPs set forth in the General Permit's SWPPP Requirements provisions where necessary to reduce or prevent pollutants in discharges.  *See* General Permit, Sections V, X.H.1-2.

R&L Lumber has failed to implement and maintain the minimum BMPs required by the General Permit as evidenced by the exceedances identified above.  Specifically, R&L Lumber has failed to comply with the following: good housekeeping requirements, preventive maintenance requirements; spill and leak prevention and response requirements; material handling and waste management requirements; erosion and sediment controls; employee training and quality assurance; and record keeping.  Permit, Section X.H.1(a-g).

R&L Lumber has further failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including:  exposure minimization BMPs; containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs necessary to comply with the General Permit's effluent limitations.  General Permit, Sections X.H.2.

---

[1] The Facility was assigned the waste discharge identification number 1 12I030010 on December 5, 2022.

Notice of Violation and Intent to File Suit
December 30, 2022
Page 6

Each day that R&L Lumber have failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  R&L Lumber has been in violation of the BAT and BCT requirements at its Facility every day since at least December 5, 2022.

**C. R&L Lumber Has Failed to Comply with the Monitoring Requirements of the General Permit.**

The General Permit requires dischargers to implement a Monitoring Implementation Plan.  General Permit, Section X.I.  As part of their monitoring plan, dischargers must identify all storm water discharge locations.  Permit, Section X.I.2.  Dischargers must then conduct monthly visual observations of each drainage area, as well as visual observations during discharge sampling events.  General Permit, Section XI.A.1 and 2.

Dischargers must collect and analyze storm water samples from two (2) storm events within the first half of each reporting year (July 1 to December 31) and two (2) storm events during the second half of each reporting year (January 1 to June 3).  General Permit, Section XI.B.  Section XI.B requires dischargers to sample and analyze during the wet season for basic parameters such as pH, total suspended solids ("TSS") and oil and grease ("O&G"), certain industry-specific parameters set forth in Table 2 of the General Permit, and other pollutants likely to be in the storm water discharged from the facility based on the pollutant source assessment.  General Permit, Section XI.B.6.  Dischargers must submit all sampling and analytical results via SMARTS within thirty (30) days of obtaining all results for each sampling event.  General Permit, Section XI.B.11.

R&L Lumber has failed to develop and implement an adequate Monitoring Implementation Plan for its Facility, and has thus violated the monitoring requirements of the General Permit.  For example, R&L Lumber has failed to monitor for every potential pollutant that is likely to be present at its Facility, including nutrients and pathogens.  In addition, R&L Lumber has failed to collect the required number of samples for each reporting period.  R&L Lumber has also failed to monitor every discharge location of storm water associated with industrial activities at its Facility.  Each day that R&L Lumber has failed to develop and implement an adequate Monitoring Implementation Plan is a separate and distinct violation of the Act and Permit.  R&L Lumber has been in violation of the Monitoring requirements every day since at least December 5, 2022.

**6. R&L Lumber Has Failed to Develop and Implement an Adequate Storm Water Pollution Prevention Plan.**

The General Permit requires dischargers to develop and implement a site-specific SWPPP.  General Permit, Section X.A.  The SWPPP must include, among other elements: (1) the facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9)

Notice of Violation and Intent to File Suit
December 30, 2022
Page 7

annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable. *See id.*

Dischargers must revise their SWPPP whenever necessary and certify and submit via the Regional Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") their SWPPP within 30 days whenever the SWPPP contains significant revisions(s); and, certify and submit via SMARTS for any non-significant revisions not more than once every three (3) months in the reporting year. General Permit, Section X.B.

CATs' investigation indicates that R&L Lumber has been operating with an inadequately developed and implemented SWPPP in violation of General Permit requirements. R&L Lumber has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary, resulting in the Facility's numerous continuing effluent limitation violations.

Each day R&L Lumber failed to develop and implement an adequate SWPPP at its Facility is a violation of the General Permit. The SWPPP violations described above were at all times in violation of Section X of the General Permit. R&L Lumber has been in violation of these requirements at its Facility every day since at least December 5, 2022.

**III.    Persons Responsible for the Violations.**

CATs puts R&L Lumber on notice that they are the persons and entities responsible for the violations described above. If additional persons are subsequently identified as also being responsible for the violations set forth above, CATs puts R&L Lumber on formal notice that it intends to include those persons in this action.

**IV.    Name and Address of Noticing Parties.**

The name, address and telephone number of each of the noticing parties is as follows:

Patricia Clary, Executive Director
Californians for Alternatives to Toxics
P.O. Box 900
Eureka, CA 95502
(707) 834-4833

**V.    Counsel.**

CATs has retained legal counsel to represent it in this matter. Please direct all communications to:

Notice of Violation and Intent to File Suit
December 30, 2022
Page 8

Andrew L. Packard                       William Verick
William N. Carlon                       Klamath Environmental Law Center
Law Offices of Andrew L.                1125 16th Street, Suite 204
Packard                                 Arcata, CA 95521
245 Kentucky Street, Suite B3           (707) 630-5061
Petaluma, CA 94952                      wverick@igc.org
(707) 782-4060
andrew@packardlawoffices.com
wncarlon@packardlawoffices.com


**VI.   Conclusion**

CATs believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  We intend to file a citizen suit under Section 505(a) of the CWA against R&L Lumber and their agents for the above-referenced violations upon the expiration of the 60-day notice period.  If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period.  We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

William Carlon
Law Offices of Andrew L. Packard
Counsel for Californians for Alternatives to Toxics

Notice of Violation and Intent to File Suit
December 30, 2022
Page 9

## SERVICE LIST

## VIA CERTIFIED MAIL

        Michael Regan, Administrator
        U.S. Environmental Protection Agency
        1200 Pennsylvania Ave., N.W.
        Washington, D.C. 20460

        Martha Guzman, Regional Administrator
        U.S. Environmental Protection Agency, Region IX
        75 Hawthorne Street
        San Francisco, CA 94105

        Merrick B. Garland, U.S. Attorney General
        U.S. Department of Justice
        950 Pennsylvania Avenue, N.W.
        Washington, DC 20530-0001

        Eileen Sobeck, Executive Director
        State Water Resources Control Board
        P.O. Box 100
        Sacramento, CA 95812

        Matthias St. John, Executive Officer
        North Coast Regional Water Quality Control Board
        5550 Skylane Boulevard Suite A
        Santa Rosa, CA 95403

**ATTACHMENT A**
**Notice of Intent to File Suit, R&L Lumber**
**Significant Rain Events,* December 5, 2022 – December 30, 2022**

December 5, 2022

December 9, 2022

December 10, 2022

December 11, 2022

December 23, 2022

December 26, 2022

December 27, 2022

December 28, 2022

December 29, 2022

December 30, 2022

# EXHIBIT 2



# EXHIBIT 3





# North Coast Regional Water Quality Control Board

**INSPECTION MEMO**

**Name and Location of Facility Inspected**
R&L Lumber Co.,
1220 5th Street
Arcata, Humboldt County

**Industrial General Permit**
**WDID #:** N/A (Non-filer)

**Inspection Date**
November 2, 2022

**Inspection Time**
11:00 am

**Names & Titles of Site Representative**
John (Facility staff)

**Consent for inspection Provided?**
Yes

**Notified of Inspection?**
No, conducted an unannounced inspection for non-filer identification

**Inspector Name & Affiliation**
Farzad Kasmaei, Regional Water Board

**Weather Conditions at the Time of the Inspection:**
Wet weather

**Inspection Memo Prepared By:**
Farzad Kasmaei

Industrial General Permit No. CAS000001

R&L Lumber Co.
Inspection Date: 11/02/2022

**Photos:**



Picture 1- View of the log yard after storm event. Picture taken by Farzad Kasmaei.

Industrial General Permit No. CAS000001

R&L Lumber Co.
Inspection Date: 11/02/2022



Picture 2- View of log piles stored outside within the facility's yard exposed to rain.
Picture taken by Farzad Kasmaei.

Industrial General Permit No. CAS000001

R&L Lumber Co.
Inspection Date: 11/02/2022



Picture 3- View of the stormwater inlet that receives facility's runoff from the log piles areas. Picture taken by Farzad Kasmaei.



Picture 4- View of the finish products stored along the facility's boundary/roadside vegetated swale. K-rail and fiber rolls are installed along the swale as a perimeter control BMP. Picture taken by Farzad Kasmaei.

Industrial General Permit No. CAS000001

R&L Lumber Co.
Inspection Date: 11/02/2022

Summary: Regional Water Board (RWB) staff arrived at 11:00 am to conduct an unannounced inspection for non-filer identification. Per the Facility's staff (John), R&L Lumber operates part of the property as a renter. Also, he informed me that the Industrial General Permit (IGP) enrollment was in progress. He called David, Facility's manager, during the inspection to confirm whether the IGP enrollment was complete.

Per David, the site was recently inspected by SHN (stormwater consultant) to prepare and submit the Permit Registration Documents (PRDs). I reminded the Discharger that they were in violation of the IGP requirements for failure to obtain the permit coverage, directed them to obtain the coverage ASAP to avoid further violations.

After inspection, I received a message from the Discharger's consultant stating that it is anticipated to complete the IGP enrollment by the end of November 2022.